**STATE of Minnesota, Respondent,**

v.

**Willard LeRoy DAVIDSON, Jr., Appellant.**

**No. CX–90–1304.**

Court of Appeals of Minnesota.

June 11, 1991.

Review Granted Aug. 12, 1991.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., St. Paul, Julius E. Gernes, Winona County Atty., Ann E. Merchlewitz, Asst. County Atty., Winona, for respondent.

John M. Stuart, State Public Defender, Cathryn Y. Middlebrook, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by AMUNDSON, P.J., and HUSPENI and RANDALL, JJ.

## OPINION

RANDALL, Judge.

This is an appeal from a jury verdict finding appellant Willard LeRoy Davidson, Jr. guilty of one count of sale or distribution of obscene material in violation of Minn.Stat. § 617.241, subd. 2(a) (1988). Appellant was sentenced to 91 days in jail and a fine of $3000, with a conditional stay of the jail time and $2500 of the fine. Appellant was ordered to pay $500 of the fine or to perform 100 hours of community service. All conditions were stayed pending appeal. Because the statute violates Minnesota's constitutional guarantee of due process, we vacate appellant's conviction.

## FACTS

Around November of 1988, members of the Winona Chapter of the Berean League decided to investigate the availability of pornography, if any, in the area of Winona, Minnesota. The Berean League is a Christian based organization which attempts to educate citizens on social, moral and political issues. Claiming to be concerned about adult bookstores in Winona, some of the members visited two stores in Winona on November 17th, the Ultimate Bookstore, which is an adult bookstore, and Video Hits, which is a video rental store with an adults-only section of rental movies. After viewing the stores and the materials for sale therein, the members complained to local police about the sale of hard core pornography at the Ultimate Bookstore.

Investigator Phil Goddis began an investigation acting upon the complaint of the Berean League. Goddis observed two signs on the outside of the Ultimate Bookstore. One advertised x-rated movies and the other stated that one must be 18 years of age to enter the store and have proof of age. Inside the store, Goddis observed racks of magazines and booths for coin operated videos. Goddis, without identifying himself, spoke to appellant, who was the store manager. Goddis purchased eight adult magazines.

On March 22, 1989, Goddis returned to the Ultimate Bookstore. He asked appellant about the coin-operated video machines in the booths. Appellant told him the movie played for approximately five minutes for fifty cents. Goddis viewed one of the movies for approximately ten minutes.

The movie and magazines showed numerous acts of sexual conduct. The material included detailed pictures of male and female genitals. The material protrayed sexual acts, including vaginal intercourse, anal intercourse, digital penetration, artificial stimulator penetration, masturbation, cunnilingus, fellatio and ejaculation. However, it is undisputed the material did not depict any independently illegal activity, such as beastiality or child pornography, and the material in question was sold only to consenting adults.

Goddis also went to Video Hits, a video rental store across the street from the Ultimate Bookstore. Video Hits has both general audience videos and an adults-only video section. Goddis observed films in the adults only section containing the same type of sexual acts as the materials he viewed in the Ultimate Bookstore.

On March 23, 1989, Goddis was granted a search warrant for the Ultimate Bookstore. During execution of the warrant, appellant told Goddis his full name and that he was the store manager. Appellant said he worked daily from 10:00 a.m. to 5:00 p.m. and his duties consisted of working the sales counter and writing down sales so supplies could be replaced. He did not determine what magazines were sold in the store. Appellant also said he did not have much to do with the coin-operated videos other than giving tokens or change to customers.

During the search, police seized a videotape entitled "Krazy for You" from one of the booths. Based on this videotape and the eight magazines purchased by Goddis, appellant was charged with distributing obscene material in violation of Minn.Stat. § 617.241, subd. 2(a).

As part of his case, appellant presented testimony of Dr. Janice Amberson, an expert psychologist and consultant to residential treatment centers. Dr. Amberson had also worked for three years at the University of Minnesota where she had been the coordinator for a program in Human Sexuality and Research. At the University program, Dr. Amberson treated sex offenders, people with sexual dysfunction, and marital groups.

Based on her experience and work as a sex therapist, Dr. Amberson testified about the difference between a healthy and unhealthy interest in sex. In her opinion, the seized video and magazines appealed to a healthy interest in sex. Dr. Amberson stated she uses similar videos and magazines in the treatment of her patients and, in her opinion, the magazines and video portrayed normal sexual conduct between consenting adults.

Margaret Hansen, the manager of Video Hits, also testified for the defense. Video Hits carries all types of videos, including adults-only titles. Hansen testified her customers represent all professions and that approximately one-half of her total rental business comes from her adult video selection. She testified that Video Hits never had any legal problems or community complaints that she knew of.

The jury found appellant guilty as charged. The trial court denied appellant's motions for a judgment of acquittal not withstanding the jury's verdict and for a new trial. Davidson appeals his conviction.

## ISSUES

1. Does Minn.Stat. § 617.241 violate the freedom of speech and press provisions of article I, section 3, of Minnesota's own state constitution?

2. Is Minn.Stat. § 617.241 void for vagueness or overbreadth so as to violate the guarantee of due process contained in the Minnesota constitution as applied here?

3. Does Minn.Stat. § 617.241 violate the right to privacy as guaranteed by the Minnesota Constitution?

4. Was appellant denied his right to a fair trial by the trial court's exclusion of expert testimony on the margin of error of a six-person jury in determining contempo-

rary community standards; the trial court's failure to suppress the video "Krazy for You;" the trial court's refusal to instruct the jury that if they were unable to determine what community standards are, then appellant was entitled to an acquittal; and by defining patent offensiveness in terms of acceptance rather than in terms of tolerance?"

## ANALYSIS

### I.

*Freedom of speech and press*

We start with the knowledge the United States Supreme Court has found obscene material to be outside the normal protections afforded by the first amendment to the United States Constitution.[1] *Miller v. California*, 413 U.S. 15, 23, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973). Appellant argues correctly that Minnesota may give more protection to individual liberties under our state constitution than the protection given under the federal constitution. *See State v. Hershberger*, 462 N.W.2d 393, 397 (Minn.1990) (religious liberties); *State v. Fuller*, 374 N.W.2d 722, 726 (Minn.1985) (double jeopardy clause); *Wegan v. Village of Lexington*, 309 N.W.2d 273, 281 n. 14 (Minn.1981) (equal protection); *O'Connor v. Johnson*, 287 N.W.2d 400, 405 (Minn. 1979) (rights of criminally accused).

Article I, section 3, of the Minnesota Constitution provides:

The liberty of the press shall forever remain inviolate, and all persons may freely speak, write and publish their sentiments on all subjects, being responsible for the abuse of such rights.

Appellant argues that although Minnesota's constitutional provision for free speech and press and the first amendment to the Bill of Rights are similar, Minnesota is free to acknowledge a difference between the two, and the difference should be recognized as providing more freedom under our state constitution. A state is free to provide more protections to its citizens than the U.S. Constitution, but it cannot provide less. *See State v. Gray*, 413 N.W.2d 107, 111 (Minn.1987).

The current *Miller* standard for obscenity provides:

(a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest * * *; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller*, 413 U.S. at 24, 93 S.Ct. at 2615, (1973) (citations omitted).

The Minnesota obscenity statute, Minn. Stat. § 617.241, subd. 2(a), provides in relevant part:

It is unlawful for a person, knowing or with reason to know its content and character, to:

(a) exhibit, sell, print, offer to sell, give away, circulate, publish, distribute or attempt to distribute any obscene material;

The term "obscene" is defined in Minn. Stat. § 617.241, subd. 1 as follows:

(a) "Obscene" means that the work, taken as a whole, appeals to the prurient interest in sex and depicts or describes in a patently offensive manner sexual conduct and which, taken as a whole, does not have serious literary, artistic, political, or scientific value. In order to determine that a work is obscene, the trier of fact must find:

(i) that the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest in sex;

---

1. The first amendment of our federal constitution provides:

    Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

    U.S. Const. amend. I.

(ii) that the work depicts sexual conduct specifically defined by clause (b) in a patently offensive manner; and

(iii) that the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

The sexual conduct as used in the definition of obscenity is defined in Minn.Stat. § 617.-241, subd. 1(b) as follows:

(i) An act of sexual intercourse, normal or perverted, actual or simulated, including genital-genital, anal-genital, or oral-genital intercourse, whether between human beings or between a human being and an animal.

(ii) Sadomasochistic abuse, meaning flagellation or torture by or upon a person who is nude or clad in undergarments or in a sexually revealing costume or the condition of being fettered, bound, or otherwise physically restricted on the part of one so clothed or who is nude.

(iii) Masturbation, excretory functions, or lewd exhibition of the genitals including any explicit close-up representation of a human genital organ.

(iv) Physical contact or simulated physical contact with a clothed or unclothed pubic areas or buttocks of a human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent sexual stimulation or gratification.

Appellant concedes the Minnesota obscenity statute is constitutional under the first amendment to the United States Constitution. However, appellant argues we should construe article I, section 3, of our state constitution to afford greater protection of speech and press, and that protection should include obscenity. Appellant correctly notes Minnesota has not precisely faced the issue of the validity of the *Miller* standard under our own constitution. Appellant cites Justice Otis' concurring opinion in *State v. Welke*, 298 Minn. 402, 216 N.W.2d 641, 649 (1974). Otis noted the majority in *Welke* failed to make any ruling as to the validity of the *Miller* standard under the state constitution:

No consideration has been given in the majority opinion to the validity of the rules proposed in *Miller* measured against the provisions of the Minnesota constitution. On that important issue, *Miller* is not controlling but constitutes only a prestigious precedent.

*Welke*, 216 N.W.2d at 649–50 (Otis concurring).

Appellant argues that Minnesota, like Oregon, should find that obscenity is not an exception to the historical guarantees of freedom of expression. In *State v. Henry*, 302 Or. 510, 515, 732 P.2d 9, 13 (1987), the Oregon court agreed with Justice Douglas' dissenting opinion in *United States v. 12 200–ft. Reels of Film*, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973), as setting forth the correct historical perspective on federal obscenity law. Douglas stated:

there is not the slightest evidence that the framers intended to put the newly created federal regime into the role of ombudsman over literature. * * * It was to bar such suppression that we have the first Amendment. I dare say Jefferson and Madison would be appalled at what the court espouses today. * * * The first Amendment was the product of a robust, not a prudish age.

*Id.* at 132, 93 S.Ct. at 2671. The Oregon Supreme Court determined Oregon had no well-established historical exception to freedom of expression based on obscenity. *Henry*, 732 P.2d at 16. The court stated:

The very fact that "obscenity" originally was pursued and repressed for its "anti-establishment" irreverence than for its bawdiness elsewhere and only to protect the morals of youth in this state lead us to conclude that no broad or all encompassing historical exception from the guarantees of free expression was ever intended.

*Id.*

Appellant points out Minnesota's territorial obscenity law existing at the time of the adoption of article I, section 3, was virtually identical to Oregon's territorial law. Therefore, appellant argues, Minnesota, like Oregon, has no historical basis for an obscenity exception to the state con-

stitutional protection for speech. Appellant further argues the Minnesota constitutional provision protecting speech and the press is similar to Oregon's speech and press constitutional provision.

Respondent concedes we may interpret the state constitution more broadly than the comparable federal provisions, but points out a court will "not do so lightly." *State v. Hamm*, 423 N.W.2d 379, 382 (Minn.1988). Respondent sees no reason to find a difference between the meaning of the federal freedom of speech provision (first amendment) and the state provision. Respondent distinguishes *Hershberger*, 462 N.W.2d at 397 (affording greater protection for religious liberties under Minnesota's constitution than the federal constitution), by explaining that the Minnesota freedom of religion provision contains more explicit and stronger language than the comparable federal provision. *Id.* at 397.

We find we need not decide the *Miller* standard in light of article I, section 3 of our state constitution because, even assuming for the sake of argument obscenity in Minnesota enjoys no state constitutional protection (as it enjoys none at the federal level), the criminal statute at issue is fatally defective because it is void for vagueness.

In regard to appellant's overbreadth argument, we point out that an overbreadth analysis is only called for where constitutionally protected conduct may be in harms way. The United States Supreme Court set out its first amendment overbreadth analysis:

Only a statute that is substantially overbroad may be invalidated on its face. (citations omitted) "We have never held that a statute should be held invalid on its face merely because it is possible to conceive of a single impermissible application * * *." (citations omitted) Instead, "[i]n a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the *enactment reaches a substantial amount of constitutionally protected conduct.*"

*Houston v. Hill*, 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987) (citations omitted) (emphasis added). Since we do not decide that obscenity is constitutionally protected in Minnesota, appellant cannot prevail on the overbreadth analysis. However, appellant can prevail on a void for vagueness analysis.

## II.

### *Due process and void for vagueness*

■ A statute which provides the basis of a criminal prosecution must meet due process standards under both the Minnesota and the United States Constitution. *State v. Newstrom*, 371 N.W.2d 525, 528 (Minn.1985). A statute is void for vagueness if persons of common intelligence must necessarily guess at its meaning or differ as to its application. *Id.*, at 528; *State v. Kager*, 382 N.W.2d 287, 289 (Minn. App.1986), *pet. for rev. denied* (Minn. April 24, 1986). The Minnesota Supreme Court has always "applied the rule of reason as to what degree of certainty is required." *State v. Target Stores, Inc.*, 279 Minn. 447, 470, 156 N.W.2d 908, 923 (1968).

In examining vagueness, we receive guidance from the Oregeon Supreme Court:

Even in ordinary criminal law, we doubt that the legislature can make it a crime to conduct oneself in a manner that falls short of "contemporary community standards." * * * It means that anyone who publishes or distributes arguably "obscene" words or pictures does so at the peril of punishment for making a wrong guess about a future jury's estimate of "contemporary state standards" of prurience.

*State v. Henry*, 732 P.2d at 10.

As a practical matter, "community standard" is a useless tool. It is not a standard at all until *after* the jury has returned its verdict. Distributors of erotic materials never know what or who a local government will select for prosecution, and can hardly guess at, much less know with any degree of certainty, before trial, what subjective community standard this or that six or twelve person jury in this or that com-

munity will come up with. The concept of a "community standard" might make sense as between states. The Supreme Court in *Miller* stated:

It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City.

*Miller*, 413 U.S. at 32, 93 S.Ct. at 2619. However, this is not an unusual concept. Laws defining what conduct constitutes felonies, gross misdemeanors, and misdemeanors almost always vary slightly, and at times substantially, from state to state.

The due process problem arises when you give communities in the *same state* "local option," and then do not require them to define the option, meaning the crime, *before* the trial. As an example, it is permissible in Minnesota to have some variance between communities as to the closing hour of an on or off sale liquor establishment. However, any community wishing to avail itself of a particular hour *has to set one.* No community in this state has a bar closing time which is defined only as "reasonable" or "sensible." It would be a nightmare for law enforcement, and an impossible burden on a bar owner trying to do the right thing to guess at what a particular jury might find to be the community standard for a reasonable closing hour. Any time between midnight and sunup would be in the ball park, depending on the mores and drinking habits of that town. The elected policy-making officials would have to choose a particular closing hour for the law to have any teeth, and for people to have fair notice.

This is the problem with Minnesota's "community standard" obscenity law. It does not require a community to first set a definable standard if they want to keep obscenity out. Communities get to prosecute first and establish the standard by the after-the-fact jury verdict. In this case, as noted, the materials in question portrayed various sexual acts, including different forms of penetration, masturbation, anal and oral sex, and others. The portrayal of none of these acts was specifically named as being criminal conduct in Winona. We agree they "could have been" criminal. But they were not "obscene" until measured against an undefined community standard that was further muddled by incorporating totally subjective terms, including "patently offensive," and appealing to the "prurient interests"[2] in sex.

Terms like "prurient, morbid or shameful" are, as a practical matter, unknowable in advance. Reasonable advance notice as to what is criminal is the essence of a constitutional criminal statute. Among normal, healthy, sexually well adjusted adults, one will find different opinions as to what they view as normal and what they view as shameful. You might, based on your childhood experiences, parental upbringing, and other variables, find something shameful which the majority of people find normal and healthy. Everyone is entitled to their own opinion, but in a criminal prosecution, a defendant should not be exposed to the whimsey of private opinions unknown before trial. Citizens should only be exposed to the deprivation of liberty and property based on a standard known to them *before* the alleged criminal act is committed. Defining obscenity with terms like morbid or shameful would be like defining criminal sexual conduct in the first degree with terms like "icky" and "not nice," instead of the clinical term sexual penetration. *See* Minn.Stat. § 609.342, subd. 1 (1988).

The verdict in this case does not tell us whether the "community standard" in Winona involves oral sex, anal sex, masturbation, or digital penetration, et cetera. We do not know which of the eight to ten categories of sexual acts named in the statute the jury found patently offensive. We do not know if it was one, all but one, or whether some were bad and some were okay. No one is on notice as to which acts are okay or not okay. In any given adults-

---

**2.** The United States Supreme Court has defined "prurient interest" as appealing to a morbid or shameful interest in sex rather than a normal, healthy interest in sex. *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 497–99, 105 S.Ct. 2794, 2798–99, 86 L.Ed.2d 394 (1985).

only section you will find dozens or more of different selections. Future distributors in Winona may be on reasonable notice, now that the trial has been concluded, that if they sell or distribute "Krazy for You," they are apt to be prosecuted. As to every other single video, all are still in the dark as to whether it meets Winona's community standard. Not only did Winona not start with a definable community standard, it still has not yet set one for residents.

Implicit in the constitutional safeguard of reasonable certainty is the premise that the law should carry an understandable meaning with an enforcable legal standard. *Pacific Mutual Life Ins. Co., v. Cleopatria Haslip, et al.,* —— U.S. ——, ——, 111 S.Ct. 1032, 1057, 113 L.Ed.2d 1 (1991) (dissenting, O'Connor, J.) (citing *Giaccio v. Pennsylvania,* 382 U.S. 399, 401–03, 86 S.Ct. 518, 521, 15 L.Ed.2d 447 (1966)).

Minnesota's obscenity statute would not be fatally vague if it prohibited the distribution or showing of named specific conduct, while still allowing for the defense of reasonable or serious literary, artistic, political or scientific value. A citizen would then have an idea of the criminal conduct proscribed, and could reasonably conclude a violation could lead to criminal prosecution.

Here, the conduct is subject to a provision that it may or may not be illegal, depending on what a jury finds the community standard to be the day it returns a verdict. This result, in effect, is ex post facto prosecution. Both our federal and state constitutions forbid ex post facto ("after the fact") convictions. *See* U.S. Const. art. I, § 9, cl. 3 and § 10, cl. 1; Minn. Const. art. I, § 11. The prohibition against ex post facto laws seeks to assure "that legislative acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham,* 450 U.S. 24, 28–29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981). "The ban also restricts governmental power by restraining arbitrary and potentially vindictive regulation." *Id.,* 450 U.S. at 29, 101 S.Ct. at 964 (citing *Molloy v. South Carolina,* 237 U.S. 180, 183, 35 S.Ct. 507, 508,

59 L.Ed. 905 (1915)). Based on the due process clause of the federal constitution, the prohibition against ex post facto law applies to the state judiciary just as it applies to the legislative bodies. *Bouie v. City of Columbia,* 378 U.S. 347, 353–54, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964) (an unforeseeable judicial enlargement of a criminal statute, applied retroactively, was struck down because it operated like ex post facto law).

In the application of Minn.Stat. § 617.-241, the community standard, regarding the particular material at issue, *was not known until after jury deliberation and the verdict returned.* As noted, the jury verdict still tells us nothing of the community standard in Winona. It does not state what particular act or acts were found to violate the standard. It gives no warning to someone showing or distributing one of the hundreds of other video cassettes at that store or others of what protrayals therein were found to be offensive. All persons situated like appellant are not on notice of what video is criminal unless and until the impossible task of showing every single one of the thousands of available cassettes to a jury for review is complete. And if that herculean task were done, it would be done *for only one community.* It would not, under the law, set the standard for the other hundreds of voting districts (communities) in the state. Providing for a "community standard" has superficial appeal because it sounds nice to state each town can decide for themselves what is obscene. It appears to embrace the essence of democracy. In reality, it sweeps the problem under the rug. When examined in the light of reason, "community standard" does not provide the guidance law enforcement needs, and does not provide fair notice to citizens which they need and which the constitution mandates before conduct can be prosecuted as criminal. Only obscenity is so vaguely treated. The criminal laws against homicide, theft, et cetera, are statewide and define what is against the law.

The problem is compounded by the statute because of the size and the number of possible community standards. Minn.Stat.

§ 617.241, subd. 1(c) defines "community" as the political subdivision from which persons are drawn to serve as jurors in a criminal proceeding. In Winona, population approximately 25,000, the jury pool will be at least a few thousand. It would be unlikely the members of appellant's jury knew firsthand more than a few hundred of their fellow citizens. What about juries in even larger towns such as the Twin Cities where the jury pool contains thousands and thousands of potential jurors? I suspect you would need a town of under 20 people before you might find six to twelve jurors to state they honestly believe that they know by proof beyond a reasonable doubt what everyone else in town thinks is "patently offensive" or not patently offensive, "morbid and shameful" or not morbid and shameful.

Under Minnesota's community standards test, a trial court has to end up giving an instruction like the one given here:

[C]ontemporary community standards are determined by what the community as a whole finds acceptable. The community as a whole is a society at large and not particular people or particular groups. What some people think the community ought to or ought not to accept is not important. Nor is it what you as an individual juror think is good or bad. It is what people in general, the community as a whole accepts that is determinative. In determining what the contemporary community standards of the County of Winona are, you may consider your knowledge of what is acceptable in the community as well as evidence in this case showing what appears in motion pictures, magazines and other forms of communication, together with any expert testimony. Merely because something is available in the community does not mean it is acceptable by the community but you should remember that the community may find acceptable

that which you or even a majority of people find personally distasteful.

This instruction, contrary to standard jury instructions in any other criminal trial,[3] requires a jury to go outside the record and attempt to visualize what is going through the minds of other people.

When the instruction is examined carefully, line by line, it becomes clear it tells the jury nothing about what law they are to apply. The jury is told to rely on the broadest type of generalizations such as "what the community as a whole finds acceptable," or "what people in general, the community as a whole accepts." There is not one shred of evidence in the record that this jury knew what "others" in Winona thought. If the verdict was based on what "others" thought, then appellant was denied his constitutional right to cross-examine and confront his accusers.

■ Both our state and federal constitutions provide that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." U.S. Const. amend. VI; Minn. Const. art. I, § 6. The right of confrontation is made obligatory on the states by the fourteenth amendment. *State v. Hansen*, 312 N.W.2d 96, 102 (Minn.1981). The right of confrontation includes both the opportunity to cross examine and the occasion for the jury to weigh the demeanor of the witness. *State v. Hamilton*, 289 N.W.2d 470, 475 (Minn.1979) (citing *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968)).

Here the jury was instructed to determine what the "community" thinks of the materials in question, even though the prosecution presented no evidence on this issue. The "community" was not present in the courtroom. The defense had no opportunity to cross-examine the "community" regarding its thoughts. The constitutional right to confrontation is part of the purpose of CRIM. JIG 1.02 and 3.01.

---

**3.** Standard criminal jury instructions explain to juries that evidence is what witnesses say and any exhibits submitted *at trial.* 10 Minnesota Practice, CRIM. JIG 1.02 (1990). In evaluating evidence, juries are instructed to rely on *their*

*own* experience, judgment and common sense. *Id.* Further, at the close of trial, the jury is instructed to disregard anything it has heard or seen *outside of the courtroom* about the case. *10 Minnesota Practice, CRIM. JIG 3.01 (1990).*

These instructions emphasize for the jury the importance of not speculating about what might have happened outside the courtroom, but was not admitted into evidence. CRIM. JIG 3.01 is explicit in instructing a jury that they must disregard everything that they may have seen or heard outside of the courtroom. In contrast, the instruction given here required the jury to go outside the evidence presented and consider what others in the community "might" think.

Pursuant to this instruction on community standard, it would have been permissible and completely appropriate for an individual juror during deliberation to state second and third hand hearsay he or she had heard at work or at home about what somebody else thought about "Krazy for You." The instruction guarantees the rankest type of jury speculation will take place as to what somebody's friends or relatives would have thought about the materials if they had seen them.

Minnesota's statute on obscenity did not give appellant before trial a clear and meaningful description of what materials were against the law. The statute did not provide to the jury a clear description of the law that they should apply to the facts as they found them, based only on evidence presented in open court. As applied, the statute is void for vagueness and appellant's conviction must be vacated.

### III.

*Right to privacy*

Appellant argues Minn.Stat. § 617.241 violates the right to privacy as guaranteed by the Minnesota Constitution. Although there is not an express constitutional guarantee of privacy, we have recognized such a right in Minnesota. *State v. Gray,* 413 N.W.2d 107, 111 (Minn.1987). Appellant and respondent disagree over the extent of the guarantee and whether it secures for someone the right to distribute pornography. The United States Supreme Court recognizes the right to possess obscene material in the privacy of one's own home, *Stanley v. Georgia,* 394 U.S. 557, 568, 89 S.Ct. 1243, 1249, 22 L.Ed.2d 542 (1969), but

has decided there is no corresponding right to distribute it to others. *United States v. Reidel,* 402 U.S. 351, 355, 91 S.Ct. 1410, 1412–13, 28 L.Ed.2d 813 (1971).

Appellant urges that Minnesota follow Hawaii which has reasoned that the right to possess has to logically include the right to lawfully obtain. *See State v. Kam,* 69 Haw. 483, 748 P.2d 372, 380 (1988). Because of our decision on the vagueness issue, we do not reach the issue of right to privacy.

### IV.

*Evidentiary rulings*

■ Because of judicial economy, we address the issues raised regarding the trial court's evidentiary rulings. The first ruling at issue was the trial court's exclusion of expert testimony on the alleged margin of error of a six-person jury drawn from a community the size of Winona in attempting to define a community standard. Appellant made an offer of proof that a professor of the sociology department of the University of Minnesota would have testified that given a community as large as Winona, a six-person jury would likely reflect the community standard to a degree of a plus or minus 39%.

Respondent argues that the proposed expert testimony failed the "helpfulness test" set out *State v. Helterbridle,* 301 N.W.2d 545 (Minn.1980). Under the test:

> [i]f the subject of the testimony is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions about that subject which is within their experience, then the testimony does not meet the helpfulness test.

*Id.* at 547. Also, respondent claims that the probative value of the testimony is outweighed by its danger of unfair prejudice, confusion of the issues or misleading the jury. *See* Minn.R.Evid. 403.

The trial court has broad discretion in deciding whether testimony by a qualified expert should be received. *Helterbridle,*

301 N.W.2d at 547. Arguably, the impact of the offered testimony would be an implication that, depending on the size of the community, a jury consisting of dozens to hundreds of people might need be impaneled and sworn before the so-called plus or minus margin of error would be within narrow acceptable limits. We hold the trial court did not abuse its discretion by excluding the offered testimony.

■ Appellant also challenges the trial court's failure to suppress the video "Krazy for You." At trial, appellant moved the court to have the state return the video seized from the bookstore pursuant to a search warrant. The court granted the motion because the state failed to hold an adversary hearing. The Minnesota Supreme Court requires an adversary hearing before a court may issue a warrant to seize all available copies of a book, magazine or film based on an obscenity prosecution. *Johnson v. City of Rochester*, 293 Minn. 156, 157, 197 N.W.2d 244, 245 (1972); *City of Duluth v. Wendling*, 306 Minn. 384, 388, 237 N.W.2d 79, 82 (1975).

Appellant argues that because the trial court granted the motion to return the video, Minn.Stat. § 626.21 (1990) immediately controls the admissibility of the video. Section 626.21 (1990) provides:

> If the motion [to suppress and return] is granted the property shall be restored unless otherwise subject to lawful detention, and it shall not be admissible in evidence at any hearing or trial.

This claim contradicts the real result in *Johnson*, 293 Minn. at 157, 197 N.W.2d at 247. In that case, the court ordered the return of the material in question, but permitted the trial court to take steps to preserve the evidence. *Id.* The *Johnson* adversarial hearing goes to a free speech first amendment issue. It does not turn on the fourth amendment issue of search and seizure. Here, the trial court found no violation of appellant's fourth amendment rights and properly ordered the video returned along with an appropriate protective order. *Johnson* does not call for the suppression of the video, and the trial court did

not err by returning it to appellant but allowing it as evidence at trial.

■ Appellant also challenges the trial court's refusal to instruct the jury that if they were unable to ascertain what the community standard was, appellant was entitled to an acquittal. Appellant claims the previously quoted jury instruction should have stated to the jury that if they, as a jury, failed to ascertain the contemporary community standard, then the prosecution had failed to prove its case beyond a reasonable doubt.

Refusal to give a requested instruction lies in the sound discretion of the trial court. *State v. Daniels*, 361 N.W.2d 819, 831 (Minn.1985). In evaluating instructions, a court of review reads them as a whole. *Id.* at 831–32. We find appellant's requested instruction accurate. Since the instruction given told the jury to apply a community standard, it stands to reason if they could not ascertain the community standard, the state had not proved every essential element by proof beyond a reasonable doubt. However, the fact that the instruction could have been given does not mean that it had to be given. Viewing the jury instructions as a whole, if the statute was not void for vagueness, and if appellant had been on fair notice of what was the criminal conduct to be avoided, the lack of appellant's requested instruction would not be reversible error.

■ Appellant also argues that community "toleration" rather than community "acceptance" is the appropriate standard to be applied by the factfinder in its determination of what is obscene. Appellant argues a community will "tolerate" obscenity before a community will "accept" obscenity. Respondent points out that the U.S. Supreme Court has used numerous terms to define "community standards" and has never limited that definition to what a community tolerates. We find the trial court adequately defined community standard in terms of acceptance.

Finally, appellant challenges the sufficiency of the evidence to sustain his conviction. Because our decision is based on other grounds, we do not reach this issue.

## DECISION

Minn.Stat. § 617.241 (1988) violates the Minnesota constitutional guarantee of due process because it is overly vague. Appellant's conviction pursuant to section 617.-241 is vacated.

Reversed.

AMUNDSON, Judge (concurring specially).

I concur in the result reached by Judge Randall, and write separately to emphasize my reasons for reversing appellant's conviction.

The most basic of Minnesota's constitutional principles provides that no person "shall be held to answer for a criminal offense without due process of law." Minn. Const. art. I, § 7. Embodied in this principle is the rule that criminal statutes must be sufficiently clear and definite to warn a person of what conduct is punishable. *State v. Simmons*, 258 N.W.2d 908, 910 (Minn.1977). Sufficient statutory clarity guarantees due process of law by not only providing adequate notice to citizens of prohibited conduct, but also by furnishing standards to prevent arbitrary enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). A statute that lacks such clarity is void for vagueness. I believe judging a work's "prurient interest" and "offensiveness," under a "community standards" test, as set out in Minnesota's obscenity statute, violates appellant's due process rights under the Minnesota Constitution.

The current tripartite test, set forth in *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419, (1973) and incorporated in Minnesota's obscenity statute, deems a work obscene if it appeals to prurient interest, describes sexual conduct in a patently offensive way, and lacks serious literary, artistic, political, or scientific value. The prurient interest and patently offensive components are measured by the community standard. Jurors evaluate whether an average person in the community, using contemporary community standards, would conclude the material appeals to the prurient interest and is patently of-

fensive. *Pope v. Illinois*, 481 U.S. 497, 500, 107 S.Ct. 1918, 1920–21, 95 L.Ed.2d 439 (1987).

The obscenity statute is unconstitutionally vague because there is not an *a priori* definition of what is obscene material. It is not contested the videotape and magazines depict acts of sexual conduct as enumerated in the obscenity statute. Minn. Stat. § 617.241, subd. 1(b). Knowledge of the depictions alone, however, does not mean appellant nor anyone could know the material was obscene. In fact, only after the jury finds beyond a reasonable doubt that the videotape and magazines violated contemporary community standards is the material deemed obscene. This after-the-fact finding of obscenity, with the attendant determination of criminal conduct, necessarily deprived appellant of fair notice of what conduct was prohibited.

The lack of advance warning as to prohibited conduct is inherent in delegating to the jury the authority to first ascertain the community standard and then apply it to the material in question. The jury, in other words, determines the applicable standard and then judges whether the appellant conformed to it. *See Bloom v. Municipal Court for Inglewood*, 16 Cal.3d 71, 89, 127 Cal.Rptr. 317, 329, 545 P.2d 229, 241 (1976). (Tobriner, J. dissenting). This process, however, presumes the jurors can determine what the community standard in fact is and that they will apply that standard rather than their own in deciding guilt or innocence. Scott, *Obscenity and the Law: Is it Possible for a Jury to Apply Contemporary Community Standards in Determining Obscenity?* 14 Law and Human Behavior 139, 141 (1989).

Reliance on these presumptions, however, cannot be reconciled with due process guarantees for four reasons. First, it is taken for granted that contemporary community standards are indeed ascertainable. The nebulous standard, however, may or may not exist; logic dictates the standard must be determinative before it can be applied, and if it is not, fundamental fairness requires an acquittal. *See State v. Kam*, 68 Haw. 631, 634, 726 P.2d 263, 265

(1986). In this case, appellant requested an instruction to that effect, but the trial court denied his request.

Second, the community standard, to the extent it is articulable, is fraught with such juror subjectivity that its application is unpredictable. Community standards are, in essence, equated with the juror's own personal values and tastes. This tautology allows a criminal defendant's guilt or innocence to be determined by "individual juror's subjective reactions to the materials in question rather than by a predictable application of rules of law." *Smith v. United States*, 431 U.S. 291, 316, 97 S.Ct. 1756, 1772, 52 L.Ed.2d 324 (1977) (Stevens, J. dissenting). Without resort to predictability, the defendant is required to guess about a future jury's determination of contemporary standards of offensiveness and prurience. *See State v. Henry*, 302 Or. 510, 513, 732 P.2d 9, 10 (1987). This situation requires a degree of clairvoyance on the defendant's part that is inconsistent with the constitutional requirement of fair notice.

Third, the highly charged content of an obscenity trial may encourage puritanical and majoritarian views to prevail. In concluding the *Miller* standard is unconstitutionally vague, Justice Stevens wrote:

> The average juror may well have one reaction to sexually oriented materials in a completely private setting and an entirely different reaction in a social context * * * Since obscenity is by no means a neutral subject, and since the ascertainment of a community standard is such a subjective task, the expression of individual jurors' sentiments will inevitably influence the perceptions of other jurors, particularly those who would normally be in the minority

*Smith*, 431 U.S. at 315, 97 S.Ct. at 1771 (Stevens J. dissenting). Unproveable aesthetic and moral assumptions may guide personal decisions, but they should not, even if embraced by the majority, justify regulation of other's conduct. Yet an obscenity trial permits, and in fact requires, jurors to rely on their moral assumptions in determining what is obscene.

Paradoxically, jury instructions in an obscenity case, on the one hand, instruct the jury to disregard what it may have heard or seen about the case outside the courtroom, while on the other hand, require jurors to go outside the record to personally ascertain what community members think about the materials. This takes place even though the prosecution admits no evidence as to what the community actually believes. For good reason, this process is not permitted in other areas of the law, nor should it be allowed in obscenity cases. Such juror subjectivity is antithetical to due process.

Fourth, Minnesota's obscenity statute violates due process because its lack of definite standards encourages arbitrary enforcement. In enforcing the present statute, the police can only guess if allegedly "obscene" material violates the statute; the jury must confirm the hunch by ascertaining whether the material actually conforms to the community standard. Equally important, without clear standards for the police to monitor and enforce, the mere threat of prosecution may chill expression of marginally pornographic material, even that which is constitutionally protected. Enforcement based on such indeterminate grounds is inimical to due process and freedom of expression. A more definite standard to judge obscenity is therefore required.

I acknowledge due process does not require "absolute certainty nor mathematical precision" in describing prohibited conduct; consequently standards may be stated in general and flexible terms. *State v. Reynolds*, 243 Minn. 196, 204, 66 N.W.2d 886, 891 (1954). When the question involves freedom of expression, however, the necessity of clear advance notice of prohibited conduct is particularly important. *State v. Welke*, 298 Minn. 402, 411, 216 N.W.2d 641 648 (1974). Minnesota's present obscenity law neither furnished fair notice to appellant nor controlled arbitrary and selective enforcement of the statute. Accordingly, appellant's due process rights were violated and his conviction is properly reversed.

HUSPENI, Judge (concurring in part, dissenting in part).

I concur in the majority's determination that the statute at issue here is not unconstitutionally overbroad, that the trial court did not err by failing to suppress the video in question, and that the jury instructions as a whole were sufficient to obviate the necessity of a new trial.

In addition, I would reach the two issues which the majority did not address. I believe the evidence is sufficient to sustain appellant's conviction. Further, I believe that the right of privacy is not broad enough to extend, to appellant's acts, the first amendment guarantee to possess obscene material in one's home as provided in *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

With regard to appellant's claim that a six-person jury is unable to define a community standard, I do not disagree with the analysis of Judge Randall. However, it seems that the issue raised by appellant might be brought appropriately before the trial court as a pretrial matter whereupon the trial court would have the discretion to impanel a jury of more than six persons.

However, I respectfully dissent from the majority's determination that Minn.Stat. § 617.241 (1988) is unconstitutional. Initially, it is clear that the wisdom or propriety of a statute is not a matter upon which any court may pass. As the Minnesota Supreme Court observed many years ago:

> The wisdom or propriety of the statute is not a judicial question, but one solely for the legislature. A statute may seem unwise, it may seem unjust, it may seem unreasonable in its operation upon the rights of the citizen, but that view of the law, in the absence of some conflict with the Constitution, cannot be made the basis of a refusal by the courts to enforce it. If it be deemed thus obnoxious, the complaint should be addressed to the legislature.

*Common School Dist. No. 85 v. County of Renville,* 141 Minn. 300, 304, 170 N.W. 216, 218 (1918). I make no determination of whether Minn.Stat. § 617.241 is a statute wisely or improvidently enacted. I merely conclude that it is constitutional.

All statutes are presumptively constitutional. *See Guilliams v. Commissioner of Rev.,* 299 N.W.2d 138, 142 (Minn.1980). Appellate courts must move cautiously before declaring a statute unconstitutional. *McGuire v. C & L Restaurant Inc.,* 346 N.W.2d 605, 611 (Minn.1984). Indeed, the court will only declare a statute unconstitutional if the party challenging the statute proves beyond a reasonable doubt that the statute is constitutionally infirm. *City of Richfield v. Local No. 1215, Int'l Assoc. of Firefighters,* 276 N.W.2d 42, 45 (Minn. 1979). I believe appellant has failed to meet that burden of proof in this case.

### I.

Obscenity is not protected speech under the first amendment to the United States Constitution. *Miller v. California,* 413 U.S. 15, 21, 93 S.Ct. 2607, 2613, 37 L.Ed.2d 419 (1973) (quoting *Roth v. United States,* 354 U.S. 476, 484–85, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957)); *State v. Oman,* 261 Minn. 10, 14, 110 N.W.2d 514, 518 (1961) (citing *Roth* with approval). Further, the current Minnesota obscenity law passes federal constitutional muster. *See Miller,* 413 U.S. at 24–5, 93 S.Ct. at 2615. Appellant concedes these factors.

Appellant does argue, however, that the obscenity statute at issue in this case offends the free speech guarantees of the Minnesota Constitution.[1] Admittedly, "a state supreme court may interpret its own state constitution to offer greater protection of individual rights than does the federal constitution." *State v. Fuller,* 374 N.W.2d 722, 726 (Minn.1985). The supreme court, however, will not lightly interpret our constitution more stringently than the federal constitution. *State v. Hamm,* 423 N.W.2d 379, 382 (Minn.1988).

Appellant carries the burden of showing the basis for according greater protection under the Minnesota Constitution than is accorded by the United States Constitution

---

**1.** I recognize that although the majority discusses this possible basis for a declaration of unconstitutionality, it does not appear to rest its decision upon it.

as interpreted by the United States Supreme Court. Both the Minnesota Constitution and territorial law existing at the time that constitution was written, give voice, I believe, to the attitude of the drafters regarding obscenity. Minn. Const. art. I, § 16, which provides for freedom of conscience and guarantees the right to exercise one's religious beliefs, explicitly limits that right:

> the liberty of conscience hereby secured shall not be construed as to excuse acts of *licentiousness.*

*Id.* (emphasis added). This provision recognizes a moral underpinning to the exercise of the broad rights conferred by the constitution.

More specifically, at the time of the adoption of the constitution in 1857, Minnesota had a statute prohibiting obscenity on the statute books. The statute provided:

> If any person shall import, print, publish, sell, or distribute any book, or any pamphlet, ballad, printed paper, or other thing containing obscene language, or obscene prints, pictures, figures, or other descriptions manifestly tending to the corruption of the morals of youth or shall introduce into any family, school, or place of education, or shall buy, procure, receive, or have in his possession any such book, pamphlet, ballad, printed paper, or other thing, either for the purpose of loan, sale, exhibition, or circulation, or with intent to introduce the same into any family, school, or place of education, he shall be punished by imprisonment in the county jail, not more than six months, or by a fine not exceeding two hundred dollars.

Rev.Stat. (Terr.), ch. 108 § 11 (1851).[2]

The proscription of the statute is not directed only to materials that tend to corrupt the morals of the youth but rather is a general criminal prohibition against printing, receiving, distributing, or selling materials *"containing* obscene language, *or* obscene prints, pictures, figures, *or* other descriptions manifestly tending to the corruption of [Minnesota] youth." *Id.* (emphasis added). This statute demonstrates, I believe, a contemporaneous intent that obscenity was not a form of permissible speech when the Minnesota Constitution was adopted. Appellant has presented no evidence that Minnesota intended to afford greater protection to obscene works.[3]

## II.

The majority rests its determination of unconstitutionality of section 617.241 upon the doctrine of vagueness. I believe the question of whether this statute is unconstitutionally vague has already been answered in the negative by *Miller* and by the Minnesota legislature's incorporation of the *Miller* standard into our statute. *Compare Miller,* 413 U.S. at 24, 93 S.Ct. at 2615 (*Miller* test) *with* Minn.Stat. § 617.241, subd. 1(a)(i)–(iii) (obscenity defined) and (b)(i)–(iv) (sexual conduct defined).

In *State v. Welke,* 298 Minn. 402, 216 N.W.2d 641 (1974), the Minnesota Supreme Court considered the constitutionality of a Minneapolis obscenity ordinance. The *Welke* court, in adopting [4] the analysis announced in *Miller* for evaluating whether a matter is obscene, held that:

> the word "obscene," as used in this ordinance and like legislative enactments regulating or prohibiting obscenity, * * * embrace[s] articles and publica-

---

**2.** This statute was later recodified after Minnesota was admitted to the union in Pub.Stat. ch. 96, § 11 (1858).

**3.** Appellant's reliance on *State v. Henry,* 302 Or. 510, 525, 732 P.2d 9, 17 (1987) is misplaced. The court in *Henry* rejected outright the longstanding principle (adopted in federal and Minnesota jurisprudence) that obscenity is not protected speech, finding instead that, under the broader interpretation of the Oregon Constitution free speech provision, obscenity constituted protected speech. The unique constitutional history of Oregon does not assist this court in interpreting Minnesota constitutional law. Furthermore, *Henry* does not declare the statute unconstitutional on vagueness grounds as does the majority in this case.

**4.** Justice Otis in his concurring opinion argued that the court's "adoption" of the *Miller* test constituted "mere dictum." However, the remaining eight justices of the supreme court did not join Justice Otis in his opinion.

tions which are patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, and patently offensive representations or descriptions of masturbation, excretory functions, and leud exhibition of the genitals.

*Id.* 298 Minn. at 409, 216 N.W.2d at 646–47. The court announced that adherence to this new test would pass constitutional scrutiny in Minnesota.[5] *Id.*

In the cases decided since *Welke*, the supreme court has not signaled that it would apply a new test for obscenity. *See City of Duluth v. Sarette*, 283 N.W.2d 533, 537 (Minn.1979) ("Utilization of the *Miller* guidelines as the appropriate test [is] consistent with constitutional mandates"); *Alexander v. City of St. Paul*, 303 Minn. 201, 210, 227 N.W.2d 370, 375 (1975) (citing *Miller* as example of constitutionally valid ordinance); *State v. Carlson*, 298 Minn. 415, 416, 216 N.W.2d 650, 651 (1974) ("*State v. Welke * * ** fully considers the issues of authoritative construction of an obscenity ordinance in the constitutional framework of *Miller* "); *see also Koppinger v. City of Fairmont*, 311 Minn. 186, 192–93, 248 N.W.2d 708, 712 (1976) (citing *Miller* with approval in deciding the appropriate standard for limiting nude dancing). *Welke* and its progeny signal an apparent willingness on the part of our supreme court to continue to apply the *Miller* requirements in Minnesota.

Furthermore, in *Oman*, the supreme court, addressing a statute even less specific than the one at issue in this case, held that the statute was not unconstitutionally vague under the Minnesota Constitution. *Id.*, 261 Minn. at 19, 110 N.W.2d at 521. The court specifically stated:

> We feel impelled also to reach the conclusion that the words "obscene or indecent" as used in § 617.24 are not unconstitutionally indefinite, and, furthermore, that they are not violative of the Consti-

tution of the United States *or of the state.*

*Id.* (emphasis added).

The current obscenity statute includes a number of practical protections for potential defendants. First, the materials must depict specific forms of conduct (e.g. intercourse, excretory functions). Any person selling or otherwise distributing the materials is on notice that graphic depiction of such specified conduct may constitute obscenity. *See Miller*, 413 U.S. at 27, 93 S.Ct. at 2616–17; *Oman*, 261 Minn. at 17, 110 N.W.2d at 520. Second, a prosecutor must exercise discretion in deciding whether to charge under the statute. This determination must necessarily include the evaluation of whether sufficient evidence is available to support a probable cause determination. Third, a jury drawn from a cross section of the community must decide beyond a reasonable doubt, after applying contemporary community standards, that the work is patently offensive, that it depicts a specified class of activities, that it appeals to the prurient interest, *and* that it lacks serious literary, artistic, political or scientific value before it may convict. *See* Minn.Stat. § 617.241, subd. 1(a) (definition of the term "obscene"). The United States Supreme Court is satisfied that a statute containing these protections is constitutional; Minnesota case law supports the same result.

Next, the statute's use of the contemporary community standard as the benchmark for determining whether materials are obscene does not constitute an impermissible ex post facto law. "An *ex post facto* law is one which renders an act punishable in a manner in which it was not punishable when it was committed." *Starkweather v. Blair*, 245 Minn. 371, 386, 71 N.W.2d 869, 879 (1955) (emphasis in original) (footnote omitted). In *Starkweather*, the supreme court provided guidance for interpreting the scope of the ex post facto prohibition. Quoting extensively from Justice Chase's opinion in *Calder v.*

---

**5.** The court reversed the conviction in *Welke* because the defendant did not receive notice of the new standard adopted by the supreme court.

*Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798), the *Starkweather* court stated:

> The prohibition, in the *letter,* is not to pass any law *concerning,* and *after the fact;* but the plain and obvious meaning and intention of the prohibition is this; *that the Legislatures of the several states, shall not pass laws, after a fact done by a subject, or citizen, which shall have relation to such fact, and shall punish him for having done it.*
>
> \* \* \* \* \* \*
>
> I will state *what laws* I consider *ex post facto laws,* within the *words* and the *intent* of the prohibition. 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates a crime,* or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.* \* \* \* In my opinion, the true distinction is between *ex post facto laws,* and *retrospective laws.* Every *ex post facto law* must necessarily be *retrospective;* but every *retrospective law* is not an *ex post facto law:* The former, only, are prohibited.

*Starkweather,* 245 Minn. at 387–88, 71 N.W.2d at 880 (emphasis in original). The court in *Starkweather* went on to quote Justice Story's commentary on the United States Constitution. The passage of particular importance in this case stated:

> the [ex post facto] prohibition reaches every law, whereby an act is declared a crime, and made punishable as such, when it was not a crime when done; or whereby the act, if a crime, is aggravated in enormity or punishment; or whereby different, or less evidence, is required to convict an offender than was required when the act was committed.

*Id.* at 388, 71 N.W.2d at 880 (quoting 2 Story, Constitution § 1345 (5th ed. 1891)).

The statute in controversy, as amended, has been the law in Minnesota since 1961. Neither the types of conduct, the degree of punishment nor the manner of prosecution have been changed so as to capture an unwary citizen for acts that were permissible until the legislature retroactively imposed criminal liability. This is not a case where a person performs an act believing it to be completely legal and then later learns that the law has changed to criminalize the conduct.

Finally, the jury's consideration of the contemporary community standard does not deny a defendant the right "to be confronted with the witnesses against him." Minn. Const. art. I, § 6. As Justice Brennan noted in his dissent in *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 448, 77 S.Ct. 1325, 1331, 1 L.Ed.2d 1469 (1957), a jury "represents a cross-section of the community and has a special aptitude for reflecting the view of the average person."

> The adversary system, with lay jurors as the usual ultimate fact finders in criminal prosecutions, has historically permitted triers of fact to draw on the standards of their community, guided always by limiting instructions on the law.

*Miller,* 413 U.S. at 30, 93 S.Ct. at 2618.

The jury is entrusted with deciding the fate of all criminal defendants. We indulge in a legal fiction if we believe that a jury leaves its experiences, perceptions, and knowledge of the community at the jury deliberation room door. The United States Supreme Court recognized the unique difficulties in judging whether a given work is obscene when it announced the community standard formulation. The *Miller* standard, adopted in Minnesota, accommodates differences in the standards of different communities while protecting works that have serious literary, artistic, political or scientific value.

The obscenity statute strikes a delicate balance between the constitutionally-protected right of freedom of expression and the wish to protect the public from materials that the community deems obscene.

Recognizing that delicate balance, I feel compelled to end this dissent as I began it. Reasonable minds may differ as to the wisdom of the solution chosen by the legislature to strike the balance it did between these two concerns. I conclude, however, that the legislative solution passes constitutional muster under both the United States and the Minnesota Constitutions.